IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                       No. CR 17-1923 RB

JOHN LEROY MILNE and

MANUEL PAVON-RODRIGUEZ,

    Defendants.

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
ORDER DENYING MOTIONS TO SUPPRESS**

On June 23, 2017, Border Patrol agents arrested Defendants John Leroy Milne and Manuel Pavon-Rodriguez. Mr. Milne had been driving a car with tinted windows and no visible license plate on a stretch of road notorious for drug smuggling. The car carried several burlap backpacks filled with about 111.8 kilograms of marijuana. Mr. Pavon, an undocumented alien, was hiding in the car.

On August 22, 2017, Mr. Milne filed a motion to suppress evidence obtained from the events of June 23, 2017. (Doc. 29.) Mr. Pavon initially filed a motion to join Mr. Milne's suppression motion. (Doc. 40.) Mr. Pavon subsequently acquired new counsel, and Mr. Pavon filed a motion to withdraw the joinder motion, without prejudice to raising the issue after his new counsel conducted due diligence. (Doc. 42.) On October 5, 2017, after his attorney had a chance to review the record and the transcript of Mr. Milne's evidentiary hearing, Mr. Pavon filed a motion to suppress, adopting the arguments that Mr. Milne set forth in his motion to suppress and in the evidentiary hearing. (Doc. 57.)

The Court grants Mr. Pavon's motion to withdraw joinder (Doc. 42). Before the Court are Messrs. Milne and Pavon's motions to suppress evidence from the day of their arrests (Docs. 29 and 57). Based upon the following Findings of Fact and Conclusions of Law, the Court denies the motions to suppress.

**FINDINGS OF FACT**

Federal Rule of Criminal Procedure 12(d) provides that the Court must state its essential findings on the record when factual issues are involved in deciding a motion. *See* Fed. R. Crim. P. 12(d). To determine the disputed facts, the Court held an evidentiary hearing at the request of Mr. Milne. Mr. Milne's co-defendant, Mr. Pavon, has indicated that, besides three proposed findings of fact, he does not seek to introduce any additional oral argument or evidence beyond that received at Mr. Milne's evidentiary hearing. (Doc. 57 at 2.) The Court makes the following factual findings based on the evidence adduced at the evidentiary hearing and on its scrutiny of the witnesses as they testified.

1. The Border Patrol agents are more credible than Mr. Milne, and the Court resolves any factual disputes in favor of the Border Patrol agents' testimony.

*Background and Initial Encounter*

2. Highway 80 originates in Douglas, Arizona, a border town, and runs north-south, ending after it merges into Interstate 10 in New Mexico. There are no Border Patrol checkpoints from Highway 80's origin in Douglas up to Interstate 10. For this reason, many smugglers of contraband use Highway 80 to circumvent Border Patrol checkpoints in Arizona. (*See* Tr. I at 8:14–18; 9:10–23.)[1]

---

[1] The evidentiary hearing is comprised of two sessions, one on September 18, 2017 and another on September 25, 2017. Citations to the transcript of the September 18, 2017 session (Doc. 52) will be noted as "Tr. I at __," and citations to the transcript of the September 25, 2017 session (Doc. 53) will be noted as "Tr. II at __."

3. Matthew Defayette is an agent with the United States Border Patrol, Department of Homeland Security. Mr. Defayette has been an agent for over ten years—he was stationed at the Eagle Pass South Station for approximately nine years and in Lordsburg for about a year. (Tr. I at 7:3–11.)

4. From his time with Border Patrol, Agent Defayette grew familiar with Highway 80, the areas surrounding Highway 80, and the local traffic on Highway 80. (*See* Tr. I at 7:19–25; 8:1–4, 22–25; 9:1–2; 12:4–11; 13:11–17.)

5. On June 23, 2017, Agent Defayette was on duty from 6 a.m. to 2 p.m. He was parked on State Line Road and Highway 80 in his marked patrol vehicle. (*See* Tr. I at 7:14–18; 10:17–18; 38:19–39:2.)

6. Just before 8:00 a.m., Agent Defayette saw a brown, four-door Ford Explorer (Explorer) heading north on Highway 80. Agent Defayette did not recognize the Explorer as a local vehicle, and through the Explorer's tinted windows, Agent Defayette saw a single male driver—Mr. Milne—but he could not see if there were other passengers. (*See* Tr. I at 10:5–16; 10:25–11:4.)

7. In the normal course of his duties, Agent Defayette runs records checks on license plates, but there was no license plate on the Explorer, nor could Agent Defayette see a temporary sticker. Agent Defayette decided to follow the Explorer to investigate further. (*See* Tr. I at 11:5–17.)

8. After following the Explorer for about 1.5–2 miles on Highway 80, the Explorer pulled into the parking lot of the Rodeo Tavern in Rodeo, New Mexico. Agent Defayette had not activated his lights or sirens at any point while he was following the Explorer. (Tr. I at 11:18–12:2; 13:2–7.)

9. Mr. Milne parked his Explorer parallel to Highway 80, perpendicular to the parking spots. Agent Defayette parked his vehicle behind Mr. Milne's Explorer and turned on his rear-facing emergency lights for officer safety reasons (to warn oncoming traffic). Mr. Milne could not see Agent Defayette's rear facing lights, and there was nothing physically impeding Mr. Milne from driving off. (*See* Tr. I at 14:2–15:4.)

10. Pursuant to Border Patrol policy, Agent Defayette attempted to radio dispatch to tell them that he was going to be conducting a welfare check. Because of a poor signal in the area, however, Agent Defayette was unable to reach dispatch. (Tr. I at 14:14–20; 42:25–43:9.)

11. The area in which the encounter took place—where Agent Defayette observed Mr. Milne's Explorer and where Agent Defayette and Mr. Milne parked—was only 55–60 miles from the Mexico border. (*See* Tr. I at 9:24–10:2.)

12. After parking his Explorer, Mr. Milne exited his vehicle and walked straight towards the driver's side of Agent Defayette's Border Patrol vehicle. For officer safety reasons, Agent Defayette exited his vehicle and met Mr. Milne in front of the hood of the Border Patrol vehicle. (Tr. I at 15:7–18.)

13. Agent Defayette asked Mr. Milne if everything was okay, to which Mr. Milne replied that he was stopping for something to drink. Agent Defayette thought this was odd because the Rodeo Tavern was not a grocery store, nor was it open that early in the morning. (*See* Tr. I at 15:21–16:2.)

14. Next, Agent Defayette asked Mr. Milne where he coming from and where he was heading. Mr. Milne answered that he was heading from Benson to Phoenix. Agent Defayette found this answer to be odd because Benson, Arizona, and Phoenix, Arizona,

are connected by Interstate 10, and there would be no reason for Mr. Milne to be in Rodeo. (*See* Tr. I at 16:10–16.)

15. Agent Defayette followed up by asking Mr. Milne what he was doing in Rodeo. Mr. Milne replied that he was looking for work. Again, Agent Defayette found this answer to be odd because Rodeo is a small town with few job opportunities. (*See* Tr. I at 16:24–17:5.)

16. Agent Defayette asked Mr. Milne if he could look inside the Explorer for the purpose of confirming that there was no contraband or other individual in the Explorer. Mr. Milne denied Agent Defayette's request. (Tr. I at 17:14–23.)

17. During the conversation, Mr. Milne appeared nervous and was sweating even though it was not a hot day. (Tr. I at 17:6–10.)

18. The tone of the conversation between Agent Defayette and Mr. Milne was casual. (Tr. I at 17:11–12; 17:24–18:1.)

19. Agent Defayette asked Mr. Milne to provide identification. Mr. Milne replied that he did not have identification on him, but he provided Agent Defayette with his name and date of birth. (Tr. I at 18:6–13.)

20. Agent Defayette was about to run a records check based on the information that Mr. Milne provided when Border Patrol agents Jay and Rocha arrived. (Tr. I at 18:15–16.)

*Arrival of Agents Jay and Rocha*

21. Roger Evan Jay, Jr. is an agent with the United States Border Patrol, Department of Homeland Security. Mr. Jay has been an agent for over five years. He was stationed at the Lordsburg station during the time of the incident. (Tr. I at 51:19–52:1.)

22. Rene Rocha is an agent with the United States Border Patrol, Department of Homeland Security. Mr. Rocha has been an agent for over six years. (Tr. II at 12:17–19.)

23. On the morning of June 23, 2017, Agents Jay and Rocha were on duty in a Border Patrol vehicle, going northbound on Highway 80. They heard Agent Defayette attempt to radio his location to dispatch, and they drove towards Agent Defayette's location to assist him. (Tr. I at 52:2–25.)

24. After five to ten minutes, Agents Jay and Rocha found Agent Defayette talking to Mr. Milne at Rodeo Tavern. They pulled off the road and parked their vehicle behind Agent Defayette's unit. Agents Jay and Rocha also activated their rear-facing emergency lights for officer safety reasons. Mr. Milne's Explorer remained unobstructed. (Tr. I at 53:6–55:4.)

25. After parking their vehicle, Agents Jay and Rocha exited their vehicle and approached Agent Defayette and Mr. Milne. (Tr. I at 55:22–23.)

26. After Agents Jay and Rocha approached, Agent Defayette went to Agents Jay and Rocha's Border Patrol vehicle to run records checks on Mr. Milne. (Tr. I at 18:11–13.)

27. Agent Jay had a casual conversation with Mr. Milne. During the conversation, Agent Jay asked Mr. Milne if he had a license plate. Mr. Milne informed Agent Jay that he had a temporary license plate taped to the back window of the Explorer. The temporary plate was difficult to see because of the window tinting,[2] so Agent Jay asked Mr. Milne if he could take out the temporary plate for the agents. Mr. Milne agreed to do so. (Tr. I at 56:1–25; 57:8–12.)

---

[2] The defense experiments, presented to the Court during the suppression hearing, did nothing to refute the testimony that the temporary plate was difficult to see.

6

28. Agent Jay informed Agents Defayette and Rocha that Mr. Milne had a temporary plate, and that Mr. Milne was going to retrieve the plate for the agents. All of the agents then walked over to Mr. Milne's Explorer. (Tr. I at 19:15–20:1.)

*Arrests and Search of the Explorer*

29. Mr. Milne opened the back window of the Explorer about four inches to reach for the temporary plate. As Mr. Milne did this, the agents saw burlap backpacks in the rear cargo area of the Explorer. The agents knew from experience that burlap backpacks were often used to smuggle narcotics. (Tr. I at 20:5–23.)

30. The agents then had Mr. Milne put his hands on the back of the vehicle, and Agent Jay patted Mr. Milne down for concealed weapons. Agent Defayette asked Mr. Milne what the backpacks contained, and Mr. Milne answered, "bales." Agent Defayette believed that Mr. Milne meant that there were bales of marijuana in the backpacks. Agent Defayette asked Mr. Milne whether there was anyone else inside the Explorer. Mr. Milne said that there was a person lying down in the back seat. (Tr. I at 20:16–21:13.)

31. Agent Jay arrested Mr. Milne. Agent Rocha opened the rear passenger door of the Explorer and encountered Mr. Pavon lying down in the backseat. Agent Rocha then arrested Mr. Pavon. (Tr. I at 21:13–16; Doc. 33 at 6.)

32. About ten to fifteen minutes had elapsed since Mr. Milne and Agent Defayette first pulled into the parking lot of the Rodeo Tavern. (Tr. I at 58:17–20.)

33. Upon searching the Explorer, the Border Patrol found that the five burlap backpacks contained marijuana weighing approximately 111.8 gross kilograms. The Border Patrol also later determined that Mr. Pavon is an undocumented alien. (Doc. 33 at 6–7.)

**LEGAL STANDARDS AND CONCLUSIONS OF LAW**

The Fourth Amendment protects people from unreasonable searches and seizures. *See* U.S. Const. amend. IV. Messrs. Milne and Pavon argue that they were illegally seized by the Border Patrol on June 23, 2017, and they ask the Court to suppress all evidence from the allegedly illegal stop to vindicate their Fourth Amendment rights. The government contends that the Border Patrol did not stop Messrs. Milne and Pavon, but rather that the initial interaction was consensual. According to the government, the later detention and arrests, as well as the search of the Explorer, were all justified by reasonable suspicion and probable cause that resulted from the original consensual encounter.

*Initial Encounter*

Courts have acknowledged that police questioning is a tool in the effective enforcement of criminal laws, and that it would be unrealistic to characterize every street encounter between a citizen and the police as a "seizure." *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Law enforcement officers don't always need to suspect someone of wrongdoing in order to speak to him or her. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991). If a private citizen voluntarily cooperates with non-coercive questioning by a law enforcement officer, that interaction is consensual. *See id.* at 438. Consensual encounters are not considered to be seizures and do not implicate the Fourth Amendment. *See United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996) (quoting *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir. 1996)).

But an interaction is not consensual every time a suspect cooperates with the police or consents to a search. "Consent" that is the product of official intimidation or harassment is not consent at all. *See Bostick*, 501 U.S. at 438. Ultimately, to determine whether a police-citizen encounter is consensual, the Court must ask whether, taking into account the totality of the

circumstances, a reasonable person would have felt free to ignore the police presence and go about his business. *See id.* at 437. This is a highly fact-specific inquiry, with no governing per se rules, but the Tenth Circuit has provided a list of factors that courts should consider:

> The location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor, and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Unite States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006) (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)).

Here, Agent Defayette did not stop Mr. Milne by activating his lights or siren. Agent Defayette merely followed Mr. Milne—perhaps unnerving, but not a stop. Of his own accord, Mr. Milne pulled into the Rodeo Tavern parking lot. Of his own accord, Mr. Milne exited his vehicle and approached Agent Defayette for a conversation. The encounter took place at a public setting; there was only one Border Patrol agent; Agent Defayette did not take any of Mr. Milne's personal effects; Mr. Milne's Explorer was unobstructed; and Agent Defayette and Mr. Milne spoke in a normal tone. Taking into account the totality of the circumstances, a reasonable person would have felt free to terminate the encounter with Agent Defayette and go about his business. The Court finds that the initial encounter between Agent Defayette and Mr. Milne was consensual and did not implicate the Fourth Amendment.

### *Arrival of Agents Jay and Rocha*

Border Patrol agents may briefly detain people for questioning if they have reasonable suspicion based on specific and articulable facts that the person is an illegal alien or is involved in criminal activity. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975), *see also* 8

9

C.F.R. § 287.8(b)(2). Whether an officer had reasonable suspicion depends on whether the officer had some minimal level of objective justification for detaining a person. *See United States v. Sokolow*, 490 U.S. 1, 7–8 (1989) (citations omitted). This minimum level of objective justification must be something more than an inchoate and unparticularized suspicion or hunch, *see id.* at 15, but is less than the justification required for both the preponderance of the evidence and probable cause standards, *see id.* at 7.

In determining whether there is reasonable suspicion to stop a car in the border area, officers may consider a number of factors, including (but not limited to):

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Cheromiah*, 455 F.3d 1216, 1220–21 (10th Cir. 2006). Because factors that may seem innocent by themselves could collectively amount to reasonable suspicion, courts should not evaluate each factor in isolation, but should instead consider the "totality of the circumstances." *See id.* at 1221. "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

Not only must law enforcement officers have reasonable suspicion in order to commence an investigatory detention, but the actual detention must be reasonable too. *See Shareef*, 100 F.3d at 1500. To be reasonable, the investigatory detention must be reasonably related in scope to the circumstances that justified the stop, *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc), and the stop must last no longer than necessary to complete the purpose of the

stop, *see Rodriguez v. United* States, 135 S. Ct. 1609, 1614 (2015). In assessing whether a stop lasted too long, a court can examine whether the officer diligently pursued a means of investigation that was likely to quickly confirm or dispel his suspicion. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985). Courts should keep in mind, however, that officers are reacting to a developing situation and refrain from "indulg[ing] in unrealistic second-guessing." *See id*.

Mr. Milne is right that the Tenth Circuit has been wary of finding reasonable suspicion where doing so would subject a large number of innocent travelers to seizures at the unfettered discretion of law enforcement. *See e.g., United States v. Monsisvais*, 907 F.2d 987, 992 (10th Cir. 1990) (court declined to "subject to stop every heavily loaded out-of-state vehicle traveling this stretch of roadway that is capable of transporting and concealing human beings"), *United States v. Miranda-Enriquez*, 941 F.2d 1081, 1083 (10th Cir. 1991) (court declined to find reasonable suspicion for "every out-of-state driver traveling on New Mexico highway 52 at 9 p.m. with a dusty car who does not turn his or her head to look for oncoming cars"). However, the instant case is not one where the government asks the Court to find reasonable suspicion merely because a non-local vehicle was traveling on a road notorious for smuggling.

As discussed, the initial interaction between Agents Defayette and Mr. Milne was consensual. By the time Agents Jay and Rocha arrived, Mr. Milne had already volunteered suspicious answers to several of Agent Defayette's questions: Mr. Milne said he was stopping at Rodeo Tavern for a drink, even though the tavern was closed; Mr. Milne said he was traveling to Phoenix from Benson, Arizona, even though that would mean that he had gone over a hundred miles out of his way on an indirect route when Benson and Phoenix are connected by Interstate 10; and Mr. Milne said he was in the Rodeo area looking for work, even though there are few job

11

opportunities in Rodeo. Additionally, even if Mr. Milne were looking for work, that still does not explain why he was in Rodeo if his itinerary called for him to travel from Benson to Phoenix. This series of suspicious answers, coupled with Mr. Milne's nervous demeanor, Mr. Milne's lack of identification, and the fact that Mr. Milne was driving a car with tinted windows and no visible license plate in an area near the border known for smuggling, was enough to create reasonable suspicion that would justify briefly detaining Mr. Milne when Agents Jay and Rocha arrived. The Court does not need to examine whether the interaction remained consensual when Agents Jay and Rocha arrived because the Court finds that the agents at that point had reasonable suspicion to briefly detain Mr. Milne.

If Mr. Milne had been detained when Agents Jay and Rocha arrived, the detention was reasonable and lasted no longer than necessary. The Border Patrol agents acted diligently to confirm or dispel their suspicion: the agents asked Mr. Milne basic questions, such as his business in the area, and they asked to see Mr. Milne's license plate and attempted to run a records check on Mr. Milne. The entire interaction between the Border Patrol agents and Mr. Milne was only about ten to fifteen minutes.

The Border Patrol did not violate Mr. Milne's Fourth Amendment rights when Agents Jay and Rocha arrived because the agents had reasonable suspicion to detain Mr. Milne and any detention was reasonable and no longer than necessary.

### *Arrests and Search of the Explorer*

An arrest is the most intrusive form of Fourth Amendment seizures and is valid only if the government proves that it had probable cause to believe that the suspect was involved in criminal activity. *Davis*, 94 F.3d at 1468. Whether there is probable cause to believe that an individual is involved in criminal activity turns on the totality of the circumstances. *See Florida*

*v. Harris*, 568 U.S. 237, 244 (2013). Specifically, law enforcement officers have probable cause to arrest or conduct a search when the totality of the circumstances and the available facts would cause a "person of reasonable caution" to believe that the arrestee is involved in criminal activity or that contraband or evidence of a crime is present. *See id.* at 243–44. More evidence is required to create probable cause than the amount of evidence required to create reasonable suspicion. *See Sokolow*, 490 U.S. at 7. The probable cause standard is also an objective standard, and the subjective belief of the arresting officer is not dispositive. *See United States v. Davis*, 197 F.3d 1048, 1051 (10th Cir. 1999).

Subject to a few exceptions, warrantless searches are generally unreasonable under the Fourth Amendment. *See California v. Acevedo*, 500 U.S. 565, 580 (1991). One exception justifying a warrantless search of a vehicle is the automobile exception, under which "the police may search an automobile and the containers within it" if they have probable cause to believe the vehicle contains contraband or evidence of a crime. *See id.* at 580.

As mentioned, the Border Patrol agents acquired reasonable suspicion to briefly detain Mr. Milne after their initial consensual encounter. In the course of investigating their suspicion, the agents asked Mr. Milne to retrieve his temporary license plate. Mr. Milne consented, and while he was grabbing the temporary sticker, the agents saw multiple burlap backpacks in the rear cargo area of the Explorer. From experience, the agents knew that burlap backpacks are often used to smuggle narcotics. When the agents asked Mr. Milne what was in the backpacks, he gave a suspicious answer: "bales." What's more, Mr. Milne then told the agents that there was somebody lying in the backseat. These facts together would have lead a person of reasonable caution to believe that Mr. Milne was involved in criminal activity and that evidence

of a crime was present in Mr. Milne's Explorer. The Court finds that the agents had probable cause to arrest Mr. Milne and search the Explorer without a warrant.

Mr. Pavon was the individual lying in the backseat of the Explorer. Under the circumstances, a person of reasonable caution would have believed that Mr. Pavon was involved in criminal activity. The Court also finds that the agents had probable cause to arrest Mr. Pavon.

## CONCLUSION

The interaction between Border Patrol and Messrs. Milne and Pavon can be divided into three stages: (1) the initial encounter, (2) the arrival of Agents Jay and Rocha, and (3) the arrest of Messrs. Milne and Pavon and the search of Mr. Milne's Ford Explorer. At no stage of the interaction did Border Patrol violate Messrs. Milne and Pavon's Fourth Amendment rights: the initial encounter was consensual; the agents had reasonable suspicion to briefly detain Mr. Milne when Agents Jay and Rocha arrived; and the reasonable suspicion evolved into probable cause to believe that Messrs. Milne and Pavon were involved in criminal activity, which justified their arrests. The agents also had probable cause to believe that the Explorer contained evidence of a crime, which justified their search of the Explorer. The Court denies Messrs. Milne and Pavon's motions to suppress evidence (Docs. 29 and 57).

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**